**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| ANNE VAUGHT, as Personal Representative of the Estate of DAVID VAUGHT and individually, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CAUSE NO.: 1:15-CV-346-TLS |
| QUALITY CORRECTIONAL CARE, LLC, REBECCA COOK, R.N., in her individual and official capacities, KELLEY CARROLL, N.P. in her individual and official capacities, SHERIFF MARCUS E. GATTON in his official capacity, SHERIFF MARK E. HODGES in his individual and official capacities, STEVE MYERS in his individual and official capacities, SAMUEL GILLESPIE in his individual and official capacities, B. ANDERSON in his individual and official capacities, PARKVIEW HOSPITAL, INC., and SARA ZOOK, in her individual and official capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This matter comes before the Court on Defendants Parkview Hospital, Inc., and Sara Zook, R.N.'s Motion for Summary Judgment [ECF No. 50]. Plaintiff Anne Vaught filed a timely Response [ECF No. 57] on September 27, 2017, and the Defendants timely filed a Reply [ECF No. 63] on October 11, 2017. The matter is now fully briefed and ripe for review.

# FACTUAL BACKGROUND

The background is taken from the parties' pleadings, motions, and attached exhibits. On March 18, 2016, Plaintiff Anne Vaught filed her First Amended Complaint both individually and as personal representative of the estate of her late husband, David Vaught. She stated claims against eleven defendants. The Defendants include: Quality Correctional Care, LLC (QCC) an Indiana domestic company that contracted with the Whitely County Sheriff's Department to be the medical provider for its jail facility, and two QCC nurses; Sheriffs Marcus Gatton and Mark E. Hodges, the current and past duly elected Whitley County Sheriff, respectively; three officers employed by the Whitley County Sheriff's Department; Parkview Hospital, Inc.; and Sarah Zook, R.N., a nurse employed by Parkview Hospital, Inc.

The Motion for Summary Judgment involves only Defendants Parkview and Nurse Zook. The Plaintiff brought a claim for relief under 42 U.S.C. § 1983 against Nurse Zook for deliberate indifference towards her husband's serious health concerns, and is pursuing both intentional and negligent infliction of emotional distress claims against Zook and Parkview.

On December 2, 2013, the Plaintiff's husband, David Vaught, was convicted of Operating a Vehicle While Intoxicated and incarcerated in the Whitley County Jail. About three weeks later Mr. Vaught began to display signs of illness, including coughing, pain, shortness of breath, and weakness, and reported his symptoms to the staff at the Whitley County Jail and QCC. Whitley County had previously entered into a contract with QCC to provide medical services to inmates in the Whitley County Jail. On February 7, 2014, medical staff at the Whitely County Jail determined that Mr. Vaught needed to be transported to the emergency room. An officer transported him to the hospital located nearest to the Jail, which was Parkview Whitley. He was then transported to Parkview Regional Medical Center (PRMC) in Fort Wayne.

Parkview is a private, non-profit hospital that has a statutory obligation to serve anyone who presents for acute or emergency treatment.

Mr. Vaught received care at PRMC through March 7, 2014, when he was discharged. During his treatment at PRMC, Mr. Vaught stayed in a regular hospital room. He was not handcuffed and stayed amongst the general population as PRMC does not have a prison ward or holding cell. No one from Whitley County or QCC was involved in the treatment decisions or when to discharge Mr. Vaught. A Parkview treating physician made the decision to discharge Mr. Vaught from PRMC.

After the physician determined that Mr. Vaught could be appropriately discharged within two to three days, Nurse Zook, as the case manager, started to make the arrangements for his discharge. On March 5, 2014, Nurse Zook talked to a nurse at the Whitley County Jail to advise that Mr. Vaught would be discharged within the next few days and to ensure that the jail could care for him upon discharge. The jail nurse was Rebecca Cook, an employee of QCC who worked as a nurse at the Whitley County Jail. Nurse Zook communicated that Mr. Vaught was off of oxygen, up with a walker, and needed two people to assist with ambulation. Nurse Cook advised Nurse Zook that she would need time to arrange transportation.

After learning of the anticipated discharge, Nurse Cook expressed her concerns to Sheriff Hodges that the jail would not have the capacity to care for Mr. Vaught if he needed 24/7 care. Her concerns about 24/7 care were based on information from a confinement officer who had been at the hospital with Mr. Vaught a few days earlier, on March 1. At that time, Mr. Vaught was still on oxygen, needed two people for ambulation, and required a full time bed sitter. Sheriff Hodges agreed with Nurse Cook's concerns, and sent a letter to the appropriate judge to request that Mr. Vaught be considered for house arrest for the remainder of his sentence due to

the "considerable burden on the jail staff and the part time nurse" that Mr. Vaught's incarceration would impose. (Hodges Dep. Ex. CC, ECF No. 57-1 at 33; *Id.* Ex. DD, ECF No. 57-1 at 38.)

On March 6, the Plaintiff called Nurse Cook, upset that Mr. Vaught was being discharged. Nurse Cook had not been informed of the discharge date, so she called Nurse Zook for confirmation. When Nurse Zook confirmed the discharge, Nurse Cook questioned the timing of the discharge because she had been told on March 5 that it would be two to three days before Mr. Vaught was discharged, and she needed time to arrange transportation. Nurse Zook confirmed that Mr. Vaught was being discharged, and Nurse Cook advised that transportation arrangements would be made for March 7.

On March 7, 2014, Mr. Vaught was discharged to the Whitley County Jail. However, on that same date, the sentencing court issued an order staying Mr. Vaught's executed sentence upon release from the hospital to serve a one-year probation period. After the completion of the period of probation, March 7, 2015, he was to report back to the Whitley County Jail to complete the balance of the executed sentence. Accordingly, after Mr. Vaught arrived at the Jail, he went home with the Plaintiff that same day. Mr. Vaught returned to Parkview on March 12, 2014. Only then was Nurse Zook made aware that Mr. Vaught had not remained at the Whitley County Jail upon his March 7 discharge. About one week later, Mr. Vaught was discharged to hospice care. He passed away on April 24, 2014.

Nurse Zook does not have a contract to provide medical treatment to Whitley County Jail inmates. She is not aware of any policies or procedures at Parkview specifically tailored to the care or discharge of Whitley County Jail inmates. The Plaintiff has not produced evidence of a contract between the Whitley County Jail and either Parkview or Nurse Zook[1] nor has the

---

[1] Aside from a bill for services rendered.

Plaintiff provided evidence of a policy or procedure at Parkview specific to the care and discharge of Whitley County Jail inmates.

## STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The nonmoving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. [A] court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

**ANALYSIS**

The Plaintiff has brought a 42 U.S.C. § 1983 deliberate indifference claim against Nurse Zook and state law claims against both Parkview and Nurse Zook. These claims will be discussed in turn.

**A.     42 U.S.C. § 1983**

There are two elements of a § 1983 claim. A plaintiff must show that (1) a person acting under color of state law (2) deprived the plaintiff of a right secured by the federal law or the United States Constitution. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009). A non-government official or employee may act under color of state law for § 1983 purposes. *See id.* The Supreme Court has indicated that the "color of state law" criterion is the same as the "state action" requirement in Fourteenth Amendment analysis. *Id.* at 822 n.6 (collecting cases). In both analyses, courts must ultimately determine whether the defendant's actions are fairly attributable to the state. *Id.* at 823 (citing *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982)).

The Supreme Court has held that a private physician acts under color of state law for § 1983 purposes when she contracts with the state to provide medical services to inmates at a state prison hospital, even on a part-time basis. *See West v. Atkins*, 487 U.S. 42 (1988). However, the Supreme Court has not addressed whether medical care provided to a prisoner in a private facility outside of a prison constitutes state action. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 672 (7th Cir. 2012). The Seventh Circuit has developed a test based on *West* to determine whether a private medical professional who treats an in-custody patient acts under the color of state law. *Rodriguez*, 577 3d at 826–28. The Court must consider: (1) the setting in

which the medical care was rendered; (2) the degree of state control over the health care provider's decisions; (3) the voluntariness of the health care provider's relationship with the state; and (4) the relationship of the private medical provider to the prisoner. *Id.*; *see also Jones v. Cullinan*, No. 09-C-3916, 2013 WL 1340405, at *5 (N.D. Ill. Mar. 31, 2013); *Cummings v. Quakenbush*, No. 1:12-CV-1538, 2013 WL 5603933, at *4 (S.D. Ind. Oct. 10, 2013); *Gilbert v. Loftin*, No. 08-cv-0614, 2010 WL 552127, at *4 (S.D. Ill. Feb. 11, 2010). Although these four factors guide the inquiry, *West* instructs that "[i]t is the [health care provider]'s function within the state system, not the precise terms of his employment," that must be the focus of the inquiry. 487 U.S. at 55. Therefore, "the dispositive issue concerns the [trilateral] relationship among the State, the physician, and the prisoner." *Id.* at 56. The ultimate inquiry is whether the alleged state actor's actions are fairly attributable to the state. *Rodriguez*, 577 F.3d at 823 (citing *Rendell-Baker*, 457 U.S. 830).

### 1. *Setting of Medical Care*

One of the factors a court should consider is "the setting in which the medical care [was] rendered." *Rodriguez*, 577 F.3d at 826. Medical care that is provided in a correctional institute is necessarily impacted by the "nonmedical functions of prison life." (*Id.*) (quoting *West*, 487 U.S. at 56–57 n.1)). However, health services provided outside of a prison or jail may also constitute state action for § 1983 purposes, as long as there is a sufficient degree of state control. *Id.* at 826–27 (noting that the statement in *West* about the setting of care "makes clear that state control is highly relevant"); *see also id.* at 827 (stating that the focus is not on the venue but on "the *degree* to which the professional decisions made in rendering the care are influenced by the status of the patient as a prisoner and the directives of the state").

7

The parties agree that Nurse Zook rendered care to Mr. Vaught at PRMC, outside of the Whitley County Jail. According to the Defendants' evidence, Mr. Vaught was treated as any other patient would have been. For example, PRMC does not have a prisoner ward. *Cf. Rodriguez*, 577 F.3d at 831 (holding that the plaintiff's allegation that he was placed in a prison ward of a hospital strongly suggested that the hospital "had an ongoing relationship with the prison authorities for the care of prisoner-patients in need of hospitalization"). Additionally, Mr. Vaught was not handcuffed during treatment. *Cummings*, 2013 WL 5603933, at *5 (stating that the evidence suggested that the setting and circumstances of treatment "were in some respects controlled by the State" where a prisoner was kept handcuffed in a holding cell at the hospital while he awaited treatment).

The Plaintiff does not contest any of the evidence provided by the Defendants, or otherwise present evidence that the Jail or QCC exerted any control over the care Mr. Vaught received while he was at PRMC. Instead, the Plaintiff focuses her argument on the contract between the Whitley County Jail and QCC concerning inmate medical care. The contract is not germane to this factor, and any relevance it may have is discussed later in this Order and Opinion.

Based on the uncontroverted evidence presented by the Defendants, the first factor weighs in favor of finding that Nurse Zook's actions were not fairly attributable to the State.

2. ***Degree of State Control***

Next, the Court must assess "the degree to which the professional decisions made in rendering the care are influenced by the status of the patient as a prisoner and the directives of the state, as the ultimate responsible party for the prisoner's health care, with respect to the

8

manner and mode of care." *Rodriguez*, 577 F.3d at 827. The Defendants have provided evidence that the only contact Whitley County Jail or QCC employees had with Nurse Zook occurred after an attending physician indicated that Mr. Vaught was going to be discharged and Nurse Zook began making discharge arrangements. Further, the Defendants have shown that Mr. Vaught was treated as if he were any other patient, without input from the Whitley County Jail.

The Plaintiff counters with two assertions to support her claim that Mr. Vaught's status as an inmate influenced his medical care. First, Mr. Vaught's admission record includes his inmate status. Second, a Parkview progress note states: "Patient can be discharged today. Pending clarification from the prison system." (Zook Dep., Ex. HH p. 222.) The Plaintiff argues that his medical records thus show that "the Whitely County Jail influenced his medical care and when he would be discharged from the hospital." (Pl.'s Mem. 16, ECF No. 58.)

The Court does not agree with the Plaintiff's conclusions. The intake notation that Mr. Vaught was an inmate was simply part of his history. It is not evidence that the Whitley County Jail influenced his medical care. Although Nurse Zook had to consider where Mr. Vaught would go upon discharge, that logistical detail is not evidence that Whitley County exerted control or influence over the professional decisions regarding the manner or mode of care. Nor is it evidence Whitley County controlled the discharge decision. The physician made that decision, and there is no evidence that he did so with Mr. Vaught's inmate status in mind or input from the Jail. In fact, Nurse Cook expressed displeasure with the timing of the discharge, and was uncertain that the Jail could provide the requisite level of care based on her understanding of Mr. Vaught's needs.

The evidence demonstrates that Whitley County Jail did not order Mr. Vaught's discharge, and that the professional decisions regarding Mr. Vaught's care were not influenced

9

by his inmate status or the directives of the state. Factor two does not support a finding that Nurse Zook acted under color of state law.

### 3. *Voluntariness of Relationship with the State and Detainee*

Third, the Court must assess "whether the healthcare provider voluntarily entered into its relationship with the State and the detainee[.]" *Cummings*, 2013 WL 5603933, at *4. A contract between the healthcare provider and the state is an important consideration. *Rodriguez*, 577 F.3d at 827. As the Seventh Circuit noted:

> When a party enters into a contractual relationship with the state penal institution to provide specific medical services to inmates, it is undertaking freely, and for consideration, responsibility for a specific portion of the state's overall obligation to provide medical care for incarcerated persons. In such a circumstance, the provider has assumed freely the same liability as the state. Similarly, when a person accepts employment with a private entity that contracts with the state, he understands that he is accepting the responsibility to perform his duties in conformity with the Constitution.

*Id.* Further, a private healthcare provider generally does not voluntarily accept this responsibility if it has only an "incidental and transitory relationship with the state's penal system . . . ." *Id.* The Seventh Circuit also opined on a hypothetical scenario quite similar to the instant case:

> For instance, an emergency medical system that has a preexisting obligation to serve all persons who present themselves for emergency treatment hardly can be said to have entered into a specific voluntary undertaking to assume the state's special responsibility to incarcerated persons. Rather, it has undertaken to provide a specific service, emergency medical care, to all who need those services. The fact that it does not, and cannot, discriminate against incarcerated individuals does not mean that it has agreed to step into the shoes of the state and assume the state's responsibility toward these persons.

*Id.* at 827–28 (citations omitted).

The Plaintiff has not marshalled any evidence that there was a contract between Parkview (or Nurse Zook) and the Whitley County Jail or QCC to provide medical services to inmates.

Instead, the Plaintiff insists that Parkview voluntarily assumed the state's special responsibility to Mr. Vaught because Parkview provided him with emergency care and charged the Whitley County Jail for doing so. The instant scenario is different from one where a private healthcare provider contracts directly with a state penal institution to provide specific medical services to incarcerated individuals at the penal institution. The instant scenario is also quite different from one where a third-party healthcare provider expressly contracts with a private healthcare provider who has already assumed the state's special responsibility to inmates for medical services.

Instead, Mr. Vaught needed emergency care, QCC had no existing contracts with a specific offsite emergency care provider, and QCC picked Parkview, an institution with a pre-existing obligation to serve anyone who presents for acute or emergency treatment, for Mr. Vaught's emergency treatment. Parkview treated Mr. Vaught based on its pre-existing obligation to provide treatment to anyone who presents for emergency care. Under these circumstances, Parkview did not step into the shoes of the state when it treated Mr. Vaught. These facts do not support the Plaintiff's claim that Nurse Zook's actions are fairly attributable to the state.

### 4.     *Relationship Between Private Medical Provider and Prisoner*

Finally, the Court must assess the relationship of the private provider to the incarcerated patient. *Rodriguez*, 577 F.3d at 828. The Seventh Circuit has stated that a direct, rather than attenuated, relationship between the incarcerated patient and the private provider is a prerequisite for § 1983 liability. *Id.*

> In the fulfillment of its responsibilities to the state's prison population, a state must arrange for goods and services with many entities. To the degree that a private entity does not replace, but merely assists the state in the provision of health care to prisoners, the private entity's responsibility for the level of patient care becomes more attenuated, and it becomes more difficult to characterize its actions as the assumption of a function traditionally within the exclusive province of the state.

11

*Id.* When the private entity is not a replacement for the state providing health care, but a supplement, the "situation simply does not implicate the basic concern of *West* that a state ought not be able to contract away its responsibility for providing adequate prisoner health care." *Id.* It is the function the care giver assumes—not the amount of time spent in treating the inmate that is dispositive. *West*, 487 U.S. at 56.

Nurse Zook became involved in Mr. Vaught's discharge incidentally, by virtue of his transport to Parkview when non-Parkview employees determined he needed emergency medical care. It was also incidental to the fact that Mr. Vaught was located in one of the rooms for which she was a case manager. According to her Affidavit, Mr. Vaught is the first inmate that Nurse Zook recalls working with. The Plaintiff has not presented evidence to the contrary, or otherwise shown that Whitely County or QCC regularly brings prisoners to Parkview's facilities for care under some kind of informal arrangement. Even if this factor should be construed differently given the length of Mr. Vaught's stay at PRMC, the ultimate conclusion that Nurse Zook was not a state actor would remain unchanged when all the factors, and the ultimate issue of control, are considered.

5. ***Weighing of Factors***

After reviewing the factors, the Court holds as a matter of law that Nurse Zook did not act under color of state law for the purposes of § 1983. Mr. Vaught received treatment among the general patient population and in the same manner as other patients at PRMC. The State did not dictate any decision regarding Mr. Vaught's care or his discharge, and the Plaintiff has not presented evidence that Vaught's prisoner-status otherwise affected decisions regarding his healthcare. Neither Parkview nor Nurse Zook contracted to provide specific medical services to

inmates at Whitley County Jail. Instead, they provided emergency, non-routine services that the outside contract provider, QCC, could not perform—consistent with Parkview's preexisting obligation to serve all persons who present themselves for emergency treatment. Nurse Zook's role supplemented the roles of the State and QCC. Nurse Zook's actions, taken as a whole, were therefore not fairly attributable to the state.

As a matter of policy, the Plaintiff argues that if the Court finds that Nurse Zook did not act under color of state law, then municipalities may permissibly subcontract out of constitutional obligations involving healthcare services to inmates. But neither Parkview nor Nurse Zook entered into a contract to provide medical services to the inmates at Whitley County Jail. Nor is there evidence that they regularly treated inmates based on some informal agreement, thus implicating the concern that prisons intentionally avoid responsibility for providing adequate prisoner health care by having others act in their stead. The one group that did contract to provide medical services to the inmates at Whitley County Jail, QCC, is not the subject of this Motion. Accordingly, any claims that the Plaintiff has against Nurse Zook arise under state tort law, not under federal constitutional law.

**B.  State Law Claims**

The Plaintiff has brought two state law claims against both Nurse Zook and Parkview. The Court will first analyze the Plaintiff's intentional infliction of emotional distress claim, and then address her negligent infliction of emotional distress claim.

*1.     Intentional Infliction of Emotional Distress (IIED)*

The Indiana Supreme Court first recognized intentional infliction of emotional distress (IIED) as a separate, individual tort in *Cullison v. Medley*, 570 N.E.2d 27 (Ind. 1991). IIED occurs when "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Cullison*, 570 N.E.2d at 31. Intent forms the primary basis for an IIED claim. *Id.* The requirements are construed rigorously, and a successful plaintiff must show that the defendant (1) engaged in extreme and outrageous conduct (2) which intentionally or recklessly (3) caused (4) severe emotion distress to another. *Lindsey v. DeGroot*, 898 N.E.2d 1251, 1264 (Ind. Ct. App. 2009). A successful IIED claims occurs only where the defendant's behavior "exceeds all bounds typically tolerated by a decent society and causes mental distress of a very serious kind." *Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind. Ct. App. 2011) (citing *Lindsey*, 898 N.E.2d at 1264). The Court may decide this question as a matter of law. *Id.*

The Indiana courts have withheld summary judgment on IIED claims under select circumstances. For instance, the Indiana Court of Appeals reversed summary judgment granted to a defendant hospital after the hospital revealed a patient's mental illness to certain family members after the patient expressly told the hospital not to do so. *J.H. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 19 N.E.3d 811, 819 (Ind. Ct. App. 2014). The Court of Appeals focused on the unfortunate stigmas surrounding mental health in our society as well as the patient's express wishes that the hospital withhold specific information about the patient's mental health from family members. *Id.*

In most instances, however, a defendant is entitled to summary judgment when his underlying conduct is reasonable under the circumstances. For example, the Indiana Court of Appeals upheld summary judgment against a homeowner who brought an IIED claim against

two defendant neighbors who installed surveillance cameras aimed at the homeowner's property and common yard and then filed a police report against the homeowner based on the surveillance footage. *Curry v. Whitaker*, 943 N.E.2d 354, 361–62 (Ind. Ct. App. 2011). The Court of Appeals reasoned that the neighbors' observations provided probable cause for an arrest, and hence were reasonable under the circumstances. *Id.* at 362. Similarly here, the Plaintiff herself testified that the jail's nurse and the sheriff assured Nurse Zook that Whitley County Jail could tend to Mr. Vaught's medical needs and that it was reasonable for Nurse Zook to rely on those assurances. (ECF No. 50, Ex. B, p. 209, l. 20 – p. 210, l. 4; p. 221, ll. 4–13.) Although Nurse Cook expressed concerns to the sheriff about the Jail's ability to care for Mr. Vaught 24/7, there is no evidence that she expressed these concerns to Nurse Zook. As a matter of law, Nurse Zook's conduct was not extreme or outrageous under Indiana law

2. *Negligent Infliction of Emotional Distress (NIED)*

Under Indiana law, a plaintiff must satisfy the "impact" rule to maintain a claim for negligent infliction of emotional distress (NIED). The original impact rule required: "(1) an impact on the plaintiff; (2) that causes physical injury to the plaintiff; (3) that in turn causes the emotional distress." *Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1263 (Ind. Ct. App. 2002). The Indiana Supreme Court later adopted a "modified impact rule" that required impact, but not necessarily physical injury:

> When . . . a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person, . . . such a plaintiff is entitled to maintain an action to recover for that emotional trauma without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff.

15

*Shuamer v. Henderson*, 579 N.E.2d 452, 456 (Ind. 1991). This modified impact rule still requires the Plaintiff to show that she suffered a direct physical impact. *Powdertech*, 776 N.E.2d at 1263 (citations omitted). Mere presence is insufficient. *See id.* (terminated employee did not suffer direct physical impact simply because of firing); *see also Ross v. Cheema*, 716 N.E.2d 435, 437 (Ind. 1999) (no direct physical impact, and hence no NIED claim, for individual hearing repeated, loud pounding at her door).

The Plaintiff argues that her presence near Mr. Vaught during his discharge presents a genuine issue of material fact for her NIED claim that a jury should appropriately decide. (Pl.'s Mem. 25) (arguing that she "was physically present the morning leading up to Vaught's discharge, physically walked out of the building with Vaught and the officer that was transporting him, and verbally engaged any individual in Vaught's room to try and change the situation" and thus sustained a "physical impact"). The Plaintiff's argument appears to be that, because she was physically present and took actions such as walking and speaking, she was physically effected. This is not sufficient to meet the modified impact rule.

The Plaintiff must have suffered from some physical change or physical transformation. *See Atl. Coast Airlines v. Cook*, 857 N.E.2d 989, 998–99 (Ind. 2006) (noting that the body's natural response to fear and anxiety do not suffice). For example, in *Alexander v. Scheid*, 726 N.E.2d 272 (Ind. 2000), the Indiana Supreme Court held that destruction of healthy tissue by a cancerous tumor as a result of the defendant's alleged medical malpractice was sufficient physical impact under the modified impact rule. The Plaintiff does not present evidence of a physical change. What the Plaintiff describes is presence alone, which is not sufficient. *See Powdertech*, 776 N.E.2d at 1263. Because there is no direct physical impact, the Plaintiff's NIED claim against Nurse Zook and Parkview is insufficient as a matter of law.

## CONCLUSION

For these reasons, the Court GRANTS the Defendants' Motion for Summary Judgment [ECF No. 50] and DISMISSES Defendant Sara Zook and Defendant Parkview Hospitals, Inc., from this case. All claims against the remaining Defendants remain pending.

SO ORDERED on February 1, 2018.

                                             s/ Theresa L. Springmann
                                             CHIEF JUDGE THERESA L. SPRINGMANN
                                             UNITED STATES DISTRICT COURT