# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

ANNE VAUGHT, as Personal )
Representative of the Estate of DAVID )
VAUGHT and individually, )
  )
      Plaintiff, )
  )
      v. )       CAUSE NO.: 1:15-CV-346-TLS
  )
QUALITY CORRECTIONAL CARE, )
LLC, et al., )
  )
  )
      Defendants. )

## OPINION AND ORDER

This matter comes before the Court on two Motions for Summary Judgment [ECF Nos. 69, 71]. On October 8, 2015, the Plaintiff filed the instant action in state court [ECF No. 2] against several parties, including: Quality Correctional Care, LLC (QCC) an Indiana domestic company that contracted with the Whitely County Sheriff's Department to be the medical provider for its jail facility; Rebecca Cook, R.N., and Kelley Carroll, N.P., both employed by QCC;[1] Sheriff Marcus Gatton, the current elected Whitley County Sheriff; Sheriff Mark E. Hodges, who was the duly elected Whitley County Sheriff during David Vaught's incarceration at the Whitley County Jail; Officers Steve Myers, Samuel Gillespie, Lauren Schmidt, and Braden Anderson, all employed by the Whitley County Sheriff's Department;[2] Parkview Hospital, Inc.;

---

[1] QCC, Nurse Cook, and Nurse Carroll are occasionally jointly referred to as the "QCC Defendants" in this Opinion and Order.

[2] Sheriff Hodges and Officers Myers, Gillespie, Schmidt, and Anderson are occasionally jointly referred to as the "Whitley County Defendants" in this Opinion and Order.

and Sarah Zook, R.N., a nurse employed by Parkview Hospital, Inc. The Plaintiff brought claims individually and as the administrator of David Vaught's estate based on a federal statute (42 U.S.C. § 1983), state common law (intentional infliction of emotional distress, negligent infliction of emotional distress), and state statutes (Indiana Wrongful Death Statute, Indiana Survival Action). The claims stem from the treatment David Vaught received at the Whitley County Jail and Parkview Regional Medical Center, which the Plaintiff alleged caused Vaught's death on April 24, 2014

On February 1, 2018, the Court granted summary judgment to Parkview and Nurse Zook. (*See* Opinion & Order, ECF No. 75.) The Plaintiff had sued Parkview and Nurse Zook for intentional and negligent infliction of emotional distress, and had sued Nurse Zook for relief under §1983, alleging that she was deliberately indifferent to Vaught's serious health condition.

The first Motion for Summary Judgment now before the Court was filed by Defendants Kelley Carroll, N.P.; Rebecca Cook, R.N.; and Quality Correctional Care, LLC (QCC). The second was filed contemporaneously by Sheriffs Marcus Gatton and Mark Hodges, as well as Officers Steve Myers, Samuel Gillespie, Branden Anderson, and Lauren Schmidt. Plaintiff Anne Vaught timely responded to the Motions [ECF Nos. 76, 79], and the Defendants timely replied [ECF No. 90, 96]. The matter is now fully briefed and ripe for review.

## BACKGROUND

The following background is provided by the parties' briefing and attached exhibits, and describes the dispute in the light most favorable to the Plaintiff. In October 2012, Whitley County outsourced medical services for inmates at the Whitley County Jail to Quality Correctional Care (QCC) through the Whitley County Inmate Healthcare Service Agreement

(Service Agreement). The Service Agreement provided for one physician visit per week; physician availability via telephone or email twenty-four hours per day, seven days per week; on-site nursing for twenty-five hours per week; and a nurse administrator available for consultation twenty-four hours per day, seven days per week, and who would also visit the Jail weekly. (Service Agreement at 2, ECF No. 72-2.) QCC also assumed responsibility for managing discharges and coordinating continued care for inmates in conjunction with normal discharge protocols. (*Id.* at 7.)

After the parties executed the Service Agreement, QCC held a training session for the Jail staff. Staff members learned that, among other policies and procedures, if they suspected an inmate was ill or required medical attention, they were to submit a written notification to Rebecca Cook, R.N.'s inbox or, if the situation so required, call Nurse Cook at her home. Nurse Cook provided on-site nursing care at the Jail for twenty-five hours per week. If Nurse Cook was not available, then the Jail staff were to contact Kelley Carroll, N.P., who acted as the nurse administrator, and would also visit the Jail weekly. Jail staff could also exercise their own judgment to call an ambulance if necessary. Additionally, inmates could submit their own requests for medical treatment. The Jail staff would then pass along these requests to the medical staff, and generally deferred to the medical staff's judgment regarding medical care. Jail staff were to complete Incident Reports for any inmate medical issues so that then-Sheriff Mark Hodges could appropriately react to events occurring within the Jail. Minor medical issues did not require a written Incident Report.

The events that gave rise to this litigation involved several discrete interactions over the course of six months between David Vaught, various members of the Jail staff, QCC employees, and medical personnel affiliated with Parkview Hospital, Inc. Vaught was incarcerated at the Jail

in early December 2013. The Plaintiff visited Vaught regularly, and also talked with him on the phone during his incarceration.[3] On December 2, 2013, an employee of the Whitley County Sheriff's Department, Beth Lehman, completed a Standard Medical Questions form with Vaught as part of his intake into the Jail. (ECF No. 76-13.) In that form, Lehman noted that Vaught was taking Depakote—a seizure medication—and that he had an alcohol addiction, arthritis in his shoulders and right hip, a twice broken back, high blood pressure, hearing aids in both ears, and dry skin that bleeds.

Shortly after his intake, Nurse Cook examined Vaught. During this assessment, she noted that all of his vital signs were within normal limits, but that his Depakote prescription was for a higher dosage than normal.  On December 28, 2013, the Plaintiff visited Vaught (Vaught Dep. 48:2–49:17, ECF No. 79-23) and noticed that Vaught was slow to respond and exhibited poor motor skills, and, as a result, she was concerned that Vaught's Depakote dosage was too high. She left a voicemail with Nurse Cook expressing her concerns. Nurse Cook and Nurse Carroll later reduced Vaught's Depakote dosage. (Vaught Dep. 48:2–49:17, 58:17–59:6, ECF No. 79-23.)

Nurse Cook next examined Vaught on January 5, 2014. (Cook Dep. 20:22–29:4, ECF No. 79-1.) When she arrived to work that day there was an Incident Report in her mailbox from

---

[3] The Plaintiff has submitted recorded telephone conversations between her and Vaught as part of her Responses to the Defendants' Motions for Summary Judgment. (*See* Pl. Notice of Manual Filing, ECF Nos. 77, 80.) The Court has listened to the calls, and has considered them to the extent permissible for the purpose of ruling on the Motions. While the Court withholds a determination on whether each call would be admissible at trial, it notes that certain calls do not appear to contain relevant evidence pertaining to Vaught's treatment for his lung ailments, which form the basis of his deliberate indifference claims. For example, on Calls 9, 11, 12, and 23, the Plaintiff expresses her concern that Vaught's blood has not been drawn specifically for the purposes of monitoring his reaction to regularly, properly administered seizure medication (Vaught previously skipped doses and irregularly took his seizure medication). Even on Calls 4, 7, and 8, where Vaught begins explaining his chest pain and breathing difficulties, the Plaintiff does not appear concerned with his chest pain but seems greatly worried about his seizure medication dosage. Only on Call 3—from January 31, 2014—do the Plaintiff and Vaught discuss his chest pains and his experience with the medical staff related to his chest pain in any detail.

Lauren Schmidt, a corrections officer at the Jail. The Incident Report [ECF No. 79-3] explained that the Plaintiff had called the Jail the previous evening and reported that Vaught felt foggy and shaky that evening (January 4). The Plaintiff further explained that Vaught had been shaky and foggy on previous visits and that he may be experiencing issues related to his seizure medication. During Nurse Cook's January 5, 2014, examination she noted that Vaught was slow to answer questions, but she did not think that this was unusual because he had difficulty hearing and used hearing aids, and, as a result, usually took time to answer questions. During the examination, Nurse Cook took Vaught's vitals and listened to his breathing. His blood pressure, heart rate, and oxygen saturation levels were all within normal limits, and his breathing patterns demonstrated that his lungs were clear. He did have a loose productive cough, but Nurse Cook attributed this cough to Vaught's chronic smoking history.

On January 17, 2014, Nurse Carroll reviewed the notes from Nurse Cook's January 5 examination. (Cook Dep. 29:2–4; Progress Note, ECF No. 79-5.) Nurse Carroll noted that Vaught's Depakote dosage exceeded the maximum dosage, that he reported feeling "foggy" to Nurse Cook, and that he had no seizure activity. Nurse Carroll lowered the Depakote dosage, and ordered a blood draw within ten days. The blood draw did not happen until February 2, 2014, however, because QCC had recently changed medical suppliers, and Nurse Cook had to wait until the new supplies came in to perform the blood draw. (Cook Dep. 33:11–22.) She performed the blood draw as soon as she received the supplies.

On January 24, 2014, Vaught submitted an inmate request form to see a nurse for shoulder pain caused by his coughing and chest pains. He noted that he had a lot of pain around his right lung. Nurse Cook examined Vaught that day and took his vitals, which were normal. After listening to Vaught's breathing and physically examining the space between his ribs, Nurse

Cook concluded that he was suffering from pulled muscles in his chest area. She added ibuprofen to his medication regimen, which already included Tylenol. She further instructed Vaught to follow-up with her if he did not feel better by Monday, January 27, 2014. On January 28, 2014, Nurse Cook saw Vaught again, and he did not complain of any chest pain or lung discomfort at that time. Nurse Cook did not consider transferring Vaught to an emergency department or a physician because his vital signs did not indicate a need to do so. Further, Vaught did not have a cough at that time. Because Vaught seemed more alert than he appeared on January 4, 2014, Nurse Cook believed that he was progressing.

On January 30, 2014, Cathy Schrader went to the Whitley County Jail to take Vaught on a job seeking furlough. However, when Jail staff retrieved Vaught he was breathing hard and indicated he had some breathing discomfort. Given Vaught's distress, Schrader refused to take him job searching because she feared that she lacked the resources to deal with an emergency situation beyond calling an ambulance. She did not report her concerns to the medical staff at the Jail, and reported her concerns only to a nearby Jail staff member, Kurt Babb.[4]

That same day, Kurt Babb filled out an Incident Report concerning Vaught's condition and Schrader's concern. Because of this Incident Report, Nurse Cook examined Vaught the same day. Vaught complained of shortness of breath, which had lasted for a few days. She took his vitals and listened to his breathing. His vitals were normal and his left lung sounded clear, however his right lung displayed diminished capacity. Nurse Cook attributed the diminished capacity in one lung to Vaught's history of chronic smoking. In her notes, Nurse Cook indicated that she would follow-up to see if Vaught's pain improved at the next clinic.

---

[4] Schrader filled out an Incident Report, at the Jail's request, three months after the incident on January 30, 2014.

On the morning of February 2, 2014, Vaught asked two Whitley County Sheriff's Department Officers—Officers Anderson and Gillespie—to call an ambulance for him because he was having trouble breathing. (Incident Report, ECF No. 79-25.) Officer Anderson escorted Vaught to the medical room in the Jail and took his vitals. The Officers called Nurse Cook and explained the situation to her, and she arrived about an hour and a half later. Nurse Cook took Vaught's vitals, and observed that his right lung had diminished breath sounds, he had a harsh non-productive cough, he continued to have increasing shortness of breath, and he complained of intercostal rib pain. (Medical Note, ECF No. 79-8.) His vitals otherwise appeared normal. Nurse Cook also observed that Vaught's legs were retaining fluid, and instead of improving over time looked worse than they had previously. (Cook Dep. 52:14–24.) Nurse Cook called Nurse Carroll for a recommendation on how best to proceed, and she was told to give Vaught a diuretic for the fluid retention and to hold off on a chest x-ray until the results of the blood work came back. (*Id.* at 49:11–50:3.)

Two days later (February 4), Nurse Cook completed a Progress Note detailing the plans for Vaught's treatment. (Pl. Ex. L at 13, ECF No. 79-3.) The Progress Note contained Nurse Carroll's treatment plan based on Vaught's blood work results, which came in the same day. The note included several orders, such as a course of zithromax (an antibiotic) and prednisone (an anti-inflammatory); thrice-weekly measurements of Vaught's breathing and oxygen saturation levels to be performed by Nurse Cook and reported to Nurse Carroll; and a chest x-ray. The chest x-ray was ordered on February 5, 2014, but was delayed until the following day in part due to a winter storm watch in the area. (*Id.* at 12; *see also* Cook Dep. 58:15–24.) The x-ray was ordered because the results of Vaught's blood work showed that he had an infection, and the medical staff wanted to ensure he did not have pneumonia. (Cook Dep. 59:20–22.)

On February 6, 2014, Vaught had a chest x-ray, and the report was faxed to Nurse Cook just before 2:00 P.M. (*Id.* at 60:12–23; Radiology Report, ECF No. 79-10.) Nurse Cook immediately reported the results to Nurse Carroll. (Cook Dep. 62:18–20.) The results showed a right hemithorax opacification due to extensive entire-lung pneumonia, or pneumonectomy, or pleural effusion. Nurse Carroll ordered that Vaught be sent to an emergency department, and Nurse Cook, to save time, ordered an officer (instead of an ambulance) to transport Vaught. He was taken to Parkview Whitley, and Nurse Cook called ahead to notify the hospital that Vaught was coming and also passed along copies of his last set of vitals and his x-ray report. (Cook Dep. 71:14–20.) Later that day Vaught was transported to Parkview Regional Medical Center in Fort Wayne. (Cook Dep. 71:2–11.) He received care there through March 7, 2014. (Cook Dep. 72:12–20.)

On March 1, 2014, several days before Vaught was discharged from Parkview, Whitley County Sherriff's Department Officer Steve Myers visited Vaught. Officer Myers noted that Vaught was still on oxygen and required a bed sitter every day, around the clock, because of his confusion. (Cook Dep. 80:10-23.) Vaught also needed at least two people to help him walk. On March 5, 2014, Nurse Sarah Zook from Parkview Hospital called the jail and spoke with Nurse Cook about Vaught's discharge plan. (Cook Depo. 76:22–77:8.) She told Nurse Cook that Vaught would be released from Parkview on March 7, 2014. (Cook Depo. 77:14-78:22.) Nurse Cook then expressed concern to Sheriff Hodges that the Jail did not have the resources to provide Vaught with round-the-clock care. (Cook Depo. 81:11-17.) Sheriff Hodges agreed, and that day he asked Judge Douglas Fahl, the sentencing judge, to consider modifying Vaught's sentence to house arrest so that Vaught could receive the care he needed in his recovery. (Letter to Judge Douglas Fahl, ECF No. 79-19.) Judge Fahl issued an order on March 7, 2014, modifying

Vaught's sentence so that he could serve his one year probationary period immediately upon release from Parkview. (Order, ECF No. 79-20.)

On March 7, 2014, Vaught was released from Parkview and transported to the Whitley County Jail. (Cook Dep. 78:16–18.) The Plaintiff met Sheriff Hodges at the jail, and according to the Plaintiff, Sheriff Hodges physically helped Vaught into the Plaintiff's car and fastened his seatbelt for him. (Vaught Dep. 72:21–73:2, ECF No. 79-23.) Unfortunately, Vaught's prescriptions were omitted from his discharge bag. (Cook Dep. Ex. L at 33, ECF No. 79-3.) The Plaintiff notified Nurse Cook on March 8, 2014, about this omission, and Nurse Cook called in the prescriptions that day.

Vaught continued to cough, had profound weakness, and had a rounded or distended abdomen after his discharge. (Medical Note, ECF No. 79-12.) He was admitted back into Parkview Hospital on March 12, 2014. He was ultimately released into hospice care, and died on April 24, 2014.

## LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The nonmoving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the

nuances and inconsistencies, and decide whom to believe. [A] court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## ANALYSIS

### A.      The Prison Litigation Reform Act

Before proceeding to the merits of the Plaintiff's claims, the Court must first address the Whitley County Defendants' argument that the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), prevents the Plaintiff from recovering on behalf of Vaught's Estate. In support, the Whitley County Defendants cite *Perez v. Wisconsin Department of Corrections*, 182 F.3d 532 (7th Cir. 1999). *Perez* holds that a prisoner must exhaust administrative remedies (as required by the PLRA) before filing a § 1983 claim related to medical treatment. *Perez*, 182 F.3d at 534. This case, however, is readily distinguishable from *Perez*. In *Perez*, the plaintiff was a prisoner who complained about his medical treatment while incarcerated. *See id.* In this case, the Plaintiff (Anne Vaught) was not a prisoner at the time the lawsuit was filed. Accordingly, the Plaintiff has no preliminary obligation to exhaust administrative remedies in accordance with the PLRA.

Therefore, the PLRA is inapplicable to this case. *Cf. McSwain v. Schrubbe*, 382 Fed. App'x. 500, 502–03 (7th Cir. 2010). The Court now moves to the Plaintiff's § 1983 claims.

**B.      Deliberate Indifference Claims Against the Individual Defendants**

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)) (further citation omitted). To prevail on a deliberate indifference claim, a plaintiff must prove that he (1) suffered from an objectively serious medical condition to which (2) an individual state actor[5] was deliberately indifferent. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc). None of the Defendants dispute that Vaught's medical condition was objectively serious, but each asserts that he or she did not act with deliberate indifference to his condition.

"Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) (citing *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000)). The Court must examine each Defendant's subjective state of mind to determine if he acted with deliberate indifference. *Petties*, 836 F.3d at 728 (citing *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996)). In making this inquiry, the Court must look to the totality of an inmate's care. *Id.* (citing *Cavalieri v. Shephard*, 321 F.3d 616, 625–26 (7th Cir. 2003)). This is a fact intensive analysis. There are instances in which a defendant's subjective state of mind is easily ascertainable, such as when a prison official intentionally interferes with prescribed treatment. *Estelle*, 429 U.S. at 104–05. Further, "[i]f a

---

[5] The parties do not dispute that the QCC Defendants and the Whitley County Defendants are state actors. Accordingly, for the purposes of these Motions, the Court will assume as much.

risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties*, 836 F.3d at 729 (first citing *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006), then citing *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)). But if a layperson cannot readily understand the existence of an unnecessary medical risk, then "a medical professional's treatment decision must be 'such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.'" *Id.* (quoting *Cole*, 94 F.3d at 261–62).

This is because an absence of professional judgment, rather than a disagreement on the proper course of action, imposes liability for a deliberate indifference claim. *See, e.g.*, *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, no minimally competent professional would have so responded under those circumstances."); *Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) (holding that evidence that some other medical professional would have chosen a different course of treatment was insufficient to establish a constitutional deliberate indifference claim). But "[i]t's clear that evidence of medical negligence is not enough to prove deliberate indifference[,]" and even "a mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). This is because decisions that are actually based on medical judgment cannot be made with the requisite subjective intent that forms the basis of liability for deliberate indifference claims. *Id.*

With this in mind, the Court turns its attention towards the actions taken by the individual QCC Defendants and Whitley County Defendants.

## 1.    *Nurse Cook*

The Plaintiff focuses much of her summary judgment briefing on Nurse Cook's actions. The Plaintiff argues, in essence, that Vaught first displayed symptoms of a serious medical issue beginning in December 2013, but that despite requests by him and the Plaintiff, and observations by concerned third-parties such as Cathy Schrader, he was not hospitalized until early February 2014.

Nurse Cook interacted with Vaught on several occasions. For example, she examined him on January 5, 2014. (Cook Dep. 21:8–23:7.) During this examination, Vaught's vitals were normal, but he had a loose productive cough, which Nurse Cook indicated could have been due to his history as a heavy smoker. Both lungs sounded clear. (Cook Dep. 23:13–21.) Later, on January 24, 2014, Nurse Cook examined Vaught because he complained of chest and shoulder pain, "especially when [he] cough[s]." (Cook Dep. 35:24–38:22.) She suggested that he was likely suffering from some pulled muscles, and gave him ibuprofen to supplement his current course of Tylenol. She noted that his breathing sounded clear, and that his vitals were normal. Nurse Cook again examined Vaught on January 30, 2014, after Cathy Schrader refused to take Vaught out of the Jail due to his breathing problems. (Cook Dep. 41:20–48:12.) Nurse Cook took his vitals again, but also acknowledged that he had diminished capacity in his left lung. She attributed this diminished capacity in his left lung to potential damage from his chronic smoking. At this time, she was not concerned that the lung issues stemmed from anything other than Vaught's history of heavy smoking. (Cook Dep. 48:23–25.)

On February 2, 2014, Nurse Cook again examined Vaught, and he demonstrated shortness of breath, diminished capacity in his right lung, intercostal rib pain, and increased

swelling in his lower legs. (Cook Dep. 49:11–24.) His vitals, though, were still within normal

range. Nurse Cook called Nurse Carroll for a recommendation on how best to proceed. She also

held off on scheduling a chest x-ray for Vaught until Nurse Carroll had the chance to review the

results of certain lab work. (Cook Dep. 54:3–20.) The results of the lab work came back on

February 4, and suggested that Vaught had an infection, despite the fact that his vitals were still

within normal limits. (Cook Dep. 57:11–58:14.)

  Nurse Cook asserts that she adequately responded to all of Vaught's concerns by

checking his vitals and prescribing the appropriate care for any given scenario, and that her

actions do not demonstrate deliberate indifference. The Plaintiff counters that even if Vaught's

vitals were within normal limits, there were still clear signs—such as obvious fluid retention,

diminished lung capacity, and continual subjective complaints of shortness of breath—that

required greater attention than Nurse Cook provided. But this is insufficient to establish

deliberate indifference even taking the facts in the light most favorable to the Plaintiff. At most,

the Plaintiff has established that Nurse Cook made a mistake in her treatment, and "a mistake in

professional judgment cannot be deliberate indifference." *Whiting*, 839 F.3d at 662.

  The Court notes, for example, that Nurse Cook decided against referring Vaught to a

higher level provider because his vitals were within normal range and that his lung issues could

be attributed to his history as a chronic smoker. The Plaintiff has not presented any evidence that

this conclusion was so wrong as to present an obvious risk to Vaught's health that constitutes

deliberate indifference. *See id.* at 663. Nurse Cook noted and explained Vaught's symptoms in

her notes, passed along updates to Nurse Carroll, implemented her orders, and continued a

course of treatment that would either relieve Vaught's symptoms or help the QCC medical staff

decipher their unrevealed cause. Further, the Plaintiff has not shown that Nurse Cook's

conclusions from her examinations "departed so radically from accepted professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment." *Id.* (internal citations and quotation marks omitted). As such, the Plaintiff has not carried her burden to show that Nurse Cook acted with the requisite subjective state of mind to maintain a deliberate indifference claim. Nurse Cook is therefore entitled to summary judgment.

### 2.    *Nurse Carroll*

Nurse Carroll provides her services to several county jails that contracted with QCC, including the Whitley County Jail. She visits each site weekly, and typically spends only two to four hours at a time on site. When she visited the Whitley County Jail, she would review the charts and notes prepared by Nurse Cook during the week and examine inmates if necessary.

Nurse Carroll interacted directly with Vaught only once, on February 4, 2014. (Carroll Dep. 9:19–23.) This is the same day that Vaught's lab results came in and suggested that he had an infection.[6] Otherwise, Nurse Cook was Nurse Carroll's conduit at the Jail. (Carroll Dep. 15:18–20.) Nurse Cook provided direct care to the inmates, whereas Nurse Carroll would review notes on a weekly basis during her visit. (Carroll Dep. 19:25–21:7.) The record reflects that Nurse Carroll—given her limited time on premise at the Jail—based her actions on Nurse Cook's notes or other indirect sources, rather than direct examinations or interactions with Vaught. For example, Nurse Carroll noticed that Vaught was on a higher than usually recommended dosage

---

[6] The record is not entirely clear on when the labs were ordered, although Nurse Carroll has the authority to order tests. (*See* Carroll Dep. 28:24–29:3.) The record does reflect that on January 17, 2014, Nurse Carroll asked for labs to be drawn "in 10 days." (Progress Note, ECF No. 79-4.) Nurse Cook's signature and notation shows that the labs were drawn on February 2, 2014. (*Id.*) The delay was due in part to a change in medical supplier at the Jail. (Cook Dep. 33:15–22.)

of Depakote, checked to make sure he had a valid current prescription for the dosage (he did), and later lowered the dosage when he continued to complain about feeling "foggy." (Carroll Dep. 23:8–24:14; Progress Note, ECF No. 79-4.) She advised Nurse Cook to give Vaught a diuretic for fluid retention, and knew that blood work would be forthcoming. Additionally, when Vaught's blood work signaled that he had an infection, Nurse Carroll ordered a chest x-ray, prescribed antibiotics and prednisone, and asked for additional blood work in two weeks. (Cook Dep. 58:13–59:2.) Nurse Carroll also ordered that Vaught receive emergency care immediately when Nurse Cook relayed the results of the chest x-ray to her. (Cook Dep. 60:16–22; Carroll Dep. 27:4–7.)

The evidence, even taken in the light most favorable to the Plaintiff, shows that Nurse Carroll exercised professional judgment throughout Vaught's treatment. She reviewed Nurse Cook's notes, and ordered additional tests when the notes suggested such tests were needed. She developed a concise treatment plan once Vaught's blood work suggested that he had an infection. This plan included a chest x-ray, antibiotics, a steroidal anti-inflammatory, and more in-depth monitoring of Vaught's breathing and oxygen saturation levels. When she learned about his x-ray results, she immediately ordered that he receive emergency care. The Plaintiff has presented no evidence to suggest that Nurse Carroll did not exercise professional judgment while treating Vaught, and further has not presented any evidence that her conduct represented a radical departure from professional norms and standards for a nurse practitioner. For example, the Plaintiff's expert, Nurse Fillman, has testified that professional standards of care for nurse practitioners are outside his expertise. (Fillman Dep. 36:2–11, ECF No. 96-3.) On the present record, no reasonable factfinder could determine that Nurse Carroll was deliberately indifference to Vaught's serious medical condition, and as such she is entitled to summary judgment.

***3.     Sheriff Hodges and Officers Schmidt, Anderson, Gillespie, and Myers***

The Plaintiff argues that Sheriff Hodges, in his individual capacity, and Officers Schmidt, Anderson, Gillespie, and Myers were deliberately indifferent to Vaught's objectively serious medical condition because they were aware of his serious medical condition and failed to react appropriately. The Court disagrees. The record reflects that Sheriff Hodges and the Officers were aware of Vaught's medical condition, but that alone is insufficient to support a claim for deliberate indifference.

To begin, the Plaintiff must show that Sheriff Hodges and each officer were personally involved in a decision that amounted to deliberate indifference. *Palmer v. Marion Cty.*, 327 F.3d 588, 593–94 (7th Cir. 2003); *see also Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000) ("[Section] 1983 does not allow actions against individuals merely for their supervisory role of others."). The Plaintiff has provided no evidence that Vaught ever raised a medical concern to Officer Myers; therefore, Officer Myers is entitled to judgment as a matter of law on the deliberate indifference claim against him. Contrariwise, the Plaintiff has provided evidence that Sheriff Hodges and the other officers were involved in decisions related to his medical care. However, the Court's analysis does not end there.

Non-medical prison officials are not deliberately indifferent to a prisoner's serious medical needs when the officials respond readily and promptly to the prisoner's complaints and defer to the professional judgment of medical professionals. *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008). A failure to follow up and further investigate complaints and grievances after referring to a medical professional may be negligent, "but negligence is not deliberate indifference." *Id.* The Plaintiff has produced evidence only that Sheriff Hodges and the officers

referred Vaught to Nurse Cook each time they were aware of a medical need, and that neither Sheriff Hodges nor the officers immediately referred Vaught to emergency care. Nurse Cook appeared to handle the situation, and the officers and Sheriff Hodges were entitled to defer to her medical judgment. At worst, this could be considered negligence. But, as the Seventh Circuit has held, mere negligence does not amount to deliberate indifference. The record reflects that, as a matter of law, the officers were not deliberately indifferent to Vaught's medical needs. As such, each is entitled to summary judgment.

As to Sheriff Hodges, the Plaintiff alleges that not only was he deliberately indifferent in how he responded to complaints from Vaught about his medical needs,[7] but also that he was deliberately indifferent when Vaught was sent home from the Whitley County Jail on March 7, 2014.[8] In March 2014, Nurse Cook noted that Vaught needed specialized care upon his release from Parkview, including oxygen, a 24/7 sitter, and assistance walking. She told Sheriff Hodges that the Whitley County Jail could not provide these services, and Sheriff Hodges agreed. As such, Sheriff Hodges requested that Judge Fahl alter Vaught's sentence so his medical needs could be appropriately addressed.

On this record, a reasonable factfinder could not determine that Sheriff Hodges acted with deliberate indifference towards Vaught's medical needs. He took Nurse Cook's concerns about the Whitley County Jail's inability to care for Vaught seriously, and acted accordingly by arranging for Vaught to serve his sentence outside of the Jail. If he had, for example, ignored Nurse Cook's advice and accepted Vaught into the Whitley County Jail after his discharge from

---

[7] The Court finds that Sheriff Hodges was not deliberately indifferent to Vaught's medical needs for the same reasons that the officers were not deliberately indifferent.

[8] No other officer was involved in this decision.

Parkview, then perhaps a reasonable factfinder could determine that Sheriff Hodges acted with deliberate indifference to Vaught's serious medical needs. But the opposite happened. Further, the Plaintiff's main concern with Vaught's discharge from Parkview appears to be the fact that he was discharged from the hospital without "his medications, prescriptions, medical equipment, or his discharge plan[.]" (Pl. Mem. in Supp. of Resp. 25, ECF No. 78.) However, this concern does not involve Sheriff Hodges. It involves only Parkview and its agents.

As such, Sheriff Hodges, individually, as well as Officers Myers, Gillespie, Anderson, and Schmidt, are entitled to judgment as a matter of law on the Plaintiff's deliberate indifference claim.

### C. Monell *Liability*

The Plaintiff has also brought § 1983 claims against QCC and Whitley County.[9] Municipal corporations, and private entities that contract with them to provide essential government services, may be liable under § 1983 for constitutional violations. *See Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (en banc) (first citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), then collecting cases applying *Monell* to private entities who contract to provide essential government services). For § 1983 liability to attach, a policy must give rise to the alleged constitutional harm. *Id.* at 379. A policy which can establish liability may be (1) one officially adopted and promulgated by municipal or corporate officers; (2) an unofficial custom or practice that is widespread and well-settled; or (3) one adopted by an official with final policy-making authority. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293,

---

[9] Section 1983 claims against a sheriff in his official capacity are considered claims against the county that employs him. *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1071 (7th Cir. 2012) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)).

303 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 690). Further, a municipal or corporate entity may be liable even if none of its individual officers deprive a plaintiff of a constitutional right so long as the institutional policies themselves give rise to the constitutional violation. *Glisson*, 849 F.3d at 378. The Court now turns its analysis to the *Monell* claims against QCC and Whitley County.

1.      *QCC*

Initially, the Plaintiff based its *Monell* claim against QCC on a failure to properly supervise and train its staff. (Am. Compl. ¶¶ 140–49.) "[Section 1983] culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality)). In her Response, the Plaintiff does not appear to rely on an explicit failure to train theory of liability to survive summary judgment. (*See* Pl. Resp. 30–34, ECF No. 81.) Instead, she appears to allege that a more general, widespread custom or policy resulted in Vaught's passing. In support, she highlights authority holding that an inmate healthcare provider could be liable under § 1983 where the healthcare provider did not establish any protocol for the coordinated care of inmates with chronic illnesses. *See Glisson*, 849 F.3d at 377. While the Plaintiff may not amend her complaint through summary judgment briefing, *see Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012), the Court would reach the same conclusion regardless of the theory on which the Plaintiff relies and will proceed to address her argument on the merits.

The Plaintiff relies on *Glisson*, but the facts in *Glisson* are distinguishable from the instant case. *Glisson*, like the instant case, involved an estate for a prisoner who died while serving a sentence. However, the prisoner in *Glisson*, Nicholas Glisson, suffered from several serious health problems prior to his incarceration, including a permanent stoma which resulted

from a laryngectomy; a neck brace that he needed to wear to ensure that he could properly breathe through his stoma; a severe curvature of the spine; hypothyroidism; depression; general cognitive decline; and a gastrojejunostomy tube placed in his upper abdomen for supplemental feeding. *Glisson*, 849 F.3d at 374. One of his doctors wrote a letter to the sentencing court expressing concern that given Glisson's severe disabilities, he was unlikely to survive incarceration. *Id.* at 374–75. Glisson's family provided the equipment necessary for Glisson's care to the jail where he was held, but Glisson never received them, and he was not given replacements. *Id.* at 375. During Glisson's incarceration, he saw more than ten healthcare professionals, but none developed a medical treatment plan for him. *Id.* at 375–76. He died in custody of complications relating to his laryngeal cancer, including acute renal failure, aspiration pneumonia, and hyperkalemia. *Id.* at 378. The county coroner also noted that Glisson suffered from extreme emaciation and cachexia, and a forensic pathologist determined that Glisson's rapid-onset altered mental state could have resulted from insufficient oxygen saturation and his acute renal failure. *Id.* None of his medical providers seemed to notice his deterioration over the course of his thirty-seven day incarceration.

On that record, the Seventh Circuit, sitting en banc, determined that a jury should determine whether the Indiana Department of Corrections and its healthcare provider were liable for a deliberate indifference claim where their institutional policies themselves may be deliberately indifferent to the quality of care needed by particular inmates. *Id.* at 378. In sum, if an inmate has a severe, chronic medical condition that requires longitudinal observation, then a healthcare plan needs to be developed for that inmate.

This case does not present the same concerns as those at issue in *Glisson*. In this case, the Plaintiff is not arguing that QCC operated without any a longitudinal healthcare plan for Vaught,

or that Vaught suffered from a severe, chronic illness before his incarceration that required specific care. Instead, she argues in essence that QCC's staffing model—one registered nurse on site for 25 hours per week and on call round-the-clock, and one nurse practitioner on site two to four hours per week and available during working hours for consultations with the registered nurse—is constitutionally deficient. The Plaintiff has not, however, offered evidence to show that this staffing arrangement is unreasonable under the circumstances, let alone constitutionally inadequate. That is, there is no evidence from which it can be inferred that the staffing arrangement created a substantial risk of harm to inmates. Nor is there evidence to show that QCC was aware of such risk, assuming it existed. The Plaintiff's expert did not provide any criticism of QCC's policies and procedures at the jail. (Fillman Dep. 56:4–18, ECF No. 96-3.) Instead, the Plaintiff only offers conclusory, speculative statements to support her position that QCC's staffing policy caused Vaught's death. On summary judgment, the Plaintiff must produce sufficient evidence to show that QCC was responsible for a substantial risk of harm to Vaught, that it knew of that harm, and that its failure to train its employees or utilize an alternate staffing policy was the cause of Vaught's death. Because the Plaintiff has not carried her burden to satisfy the requisite elements of a *Monell* claim against QCC, QCC is entitled to judgment as a matter of law on this claim.

2. *Whitley County*

The Plaintiff's *Monell* claim against Whitley County is insufficient as a matter of law for similar reasons. The Plaintiff again appears to focus her arguments on *Glisson* in an attempt to avoid summary judgment. As stated previously, *Glisson* is distinguishable from the instant case. The Plaintiff's main argument appears to be that Whitley County and QCC did not explicitly

detail plans for emergency services for inmates in the Service Agreement. While the Service Agreement requires QCC to arrange for all off-site services, Sheriff Hodges told Jail staff that they were free to call for an ambulance if necessary. Additionally, Jail staff had a common practice to alert a nurse on staff for any medical emergencies, and the Jail staff would defer to the medical staff's decision regarding healthcare. The Plaintiff has not provided any evidence that an alternative reporting system or a different emergency services protocol was necessary to avoid deliberate indifference to the inmates' serious medical conditions, or would have changed the outcome of Vaught's treatment. In sum, the Plaintiff has not presented sufficient evidence for a reasonable factfinder to determine that any policy or custom employed by Whitley County caused Vaught's passing. As such, Whitley County is entitled to judgment as a matter of law on the Plaintiff's *Monell* claim.


D.      **State-Law Claims**

The Plaintiff also brought several state-law claims against the Defendants. The Court "may decline to exercise supplemental jurisdiction" over state-law claims if the Court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). There are certain circumstances that rebut this presumption, specifically:

> (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514–15 (7th Cir.2009) (internal

quotation marks omitted). None of these circumstances apply to the instant case, and the Plaintiff

remains free to pursue her state-law claims against the remaining Defendants in state court.


**CONCLUSION**

For these reasons, the Court GRANTS IN PART the QCC Defendants' Motion for

Summary Judgment [ECF No. 69] and GRANTS IN PART the Whitley County Defendants'

Motion for Summary Judgment [ECF No. 71]. The Court DENIES the Motions with respect to

all state-law claims, RELINQUISHES supplemental jurisdiction over these state-law claims, and

REMANDS the case to the Huntington Superior Court.

SO ORDERED on June 21, 2018.

s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT